**TAYLOR W. FOX**
**TAYLOR W. FOX, P.C.**
AZ State Bar No. 019780
1641 E. Osborn Road, Suite 8
Phoenix, AZ  85016
Tel.: (602) 443-2220
taylor@taylorfoxlaw.com

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-24-01818-2-PHX-SHD |
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO DRAFT PRESENTENCE INVESTIGATION REPORT** |
| v. | |
| Cheyenne Mary-Lynne Ingram, | |
| Defendant | |

     Defendant Cheynne Ingram, by and through undersigned counsel and pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, objects to various portions of the Draft Presentence Report (Doc. #81) ("PSR").  Ms. Ingram submits the legal and factual bases for these objections below.

**I.     PSR at Paragraph 29: "Semiautomatic Firearm Capable of Accepting a Large Capacity Magazine" (USSG §2K2.1(a)(4)(B))**

The PSR calculates a Base Offense Level 20, claiming that "the offense involved a semiautomatic firearm capable of accepting a large capacity magazine" and that the defendant was a prohibited person.  An offender receives a Level 20 BOL if:  A) they had one felony conviction of either a crime of violence or a controlled substance offense; or B)

Despite referring to the capability, the Sentencing Commission limited the scope of this enhancement to instances in which that capability was more than theoretical, but in which the evidence showed immediate access to and use of a gun in a large capacity firing manner.  The Guidelines limit this term to semiautomatic firearms capable of firing many rounds without reloading "because at the time of the offense  (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm."  USSG 2K2.1, App. Note 2.  Mere theoretical capability of a firearm to accept a large-capacity magazine is insufficient; the magazine must have been inserted into or nearby the firearm at the time the person committed the offense.

The PSR at ¶23 identifies the relevant firearms as large capacity.  Ingram addresses each in turn.  But as an initial matter, none of the firearms purchased under Counts 2 through 15 were ever seized by law enforcement.  No ATF agent observed any magazine attached to or in close proximity of any of these firearms at any of those dates of purchase.  Presumably each of those purchases included at least one magazine.  But an

assumption is not evidence.  Therefore the following firearms referenced in Paragraph 23 can be disregarded on that basis alone:

   a)  (Count 4, 12/24/2021 purchase date):  a Glock 17 is so-called because of its standard 17-round magazine.[1]  But 15-round magazines can also be used for and sold with this firearm.  The records do not reflect what, if any, specific magazine accompanied the purchase of this firearm.

   b)  (Count 7, 1/15/2022 purchase date):  A 30-round magazine with the Count 7 Springfield rifle.

   c)  (Count 11, 1/20/2022 purchase date:  100-round and 75-round drum magazines with the Arsenal SAMK-34, 7.52 x 39 handgun, and the Romanian HG3736-N, 9 mm handgun;

   d) (Count 15, 1/29/2022 purchase date):  Glock 19X 9 mm handgun and two Glock 17 Gen 5 9 mm handguns

Agents seized neither firearms nor magazines from any of these offenses.  The only evidence they have—receipts with shorthand designations for various purchases, e.g. "MAG 9MM KCI GLOCK 33RD G2P"—are insufficient to establish what constitutes a six-level increase from what would otherwise be Ms. Ingram's Base Offense Level.  *See* USSG §6A1.3 (providing that in resolving disputed sentencing factors, the court

---

[1] The PSR identifies the firearm related to Count 8 as a Glock 17.  That is incorrect.  ATF reports document that firearm as a identifies this firearm as a Glock 43X (Bates 0002, 106).  This is relevant because a Glock 17 accepts 17-round standard magazines (and is compatible with 33-round extended magazines), while a Glock 43X uses a completely different slimline frame and magazine well that accepts only 10 or 15-round magazines.

"may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). Here there are questions regarding not only accuracy of the receipt entries, but accurate interpretations of these entries, most if not all of which are in shorthand format. Any claim that the magazines for each of these listed firearms included large capacity magazines affixed to or nearby the guns themselves at the time Ms. Ingram falsely swore to being the actual buyer of the guns, is speculative.

The only remaining firearms at issue, and the only ones that the Government seized, come from the February 10, 2022 seizure (Count 16). Agents seized guns, ammunition and magazines from three locations within the Ingram/ Navarro vehicle: 1) The front seats (two unloaded Glock handguns; no magazines or ammunition was described with them); 2) a cardboard box on the rear passenger seat (driver's side) (two Glock 17 handguns, three Glock 42 handguns, and one Rock Island Armscor M1911handgun); and 3) the trunk (two Colt CR6920 carbines and, described separately, "a plastic ammo box containing a magazine and ammunition" (Bates 0106, ¶17)).

The items seized from the vehicle were listed in a Consent to Forfeiture form (Bates 0118). Although it lists each Colt rifle with "w/(1) 30 rnd. mag," the rifles were in the trunk and unloaded, the magazines were not attached, and the plastic ammo box containing "a magazine and ammunition" was a separate container. Nothing in the Consent form specifically identifies what magazines were in the separate and enclosed ammunition box.

The Consent form also notes one additional loose "AR 30 rnd magazine". It does not identify where it was in the vehicle or whether (or if) it would have fit either of the high-capacity magazines found in the vehicle. is also noted.

There were no photos taken of the firearms, ammunition and magazines *in situ* in the vehicle from which they were all seized.

Even assuming the 30-round magazines qualify as large-capacity, whether unloaded rifles stored in a trunk alongside magazines in a separate ammo box constitutes "close proximity" is disputed. The two Glock 17 Gen5 pistols were also unloaded in a cardboard box on the rear seat; five loose 9mm magazines were separately inventoried, but their capacity is not documented anywhere in the discovery.

## II.      Paragraph 29: Prohibited Person Status Based on Drug Use

Ms. Ingram objects to the PSR's determination that she was a "prohibited person at the time she committed the offense based on her use of illicit substances contemporaneous to the commission of the instant offense." The PSR relies on the fact that Ms. Ingram disclosed marijuana and fentanyl use to agents during the February 10, 2022 interview (Bates 0106, ¶20) to retroactively classify her as a prohibited person under 18 U.S.C. §922(g)(3) for the entire period of the charged conduct (December 12, 2021 through February 10, 2022). Ms. Ingram submits that the factual record does not establish that she was an "unlawful user of or addicted to" a controlled substance during each of the straw-purchase transactions, and that the constitutional validity of §922(g)(3) itself awaits Supreme Court resolution.  There is currently a circuit split as to the validity of prohibiting drug users from possessing weapons given the protections provided under the Second Amendment.  Circuits are currently split, with at least one (the Fifth Circuit) striking that statute down as applied.  *See United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023).  In this case, the PSR's prohibited-person finding rests on Ms. Ingram's self-reported drug use during the February 10, 2022 interview. She stated she had been smoking marijuana since age 15 and first used fentanyl around Thanksgiving 2021, but

also stated she had overdosed approximately two weeks before the interview and had "since quit" (Bates 0106, ¶20). There is no drug test, medical record, or independent evidence in the discovery establishing that Ms. Ingram was actively using controlled substances at the time of each individual straw-purchase transaction.  Agents who spoke to her on February 10, 2022 presumably will not claim to her having been under the influence, or they would not have proceeded with her interview.   The government bears the burden of proving prohibited-person status by a preponderance of the evidence for sentencing enhancement purposes, and self-reported historical use without more fails to establish she was actively using during the specific dates and times at issue.

### III.     Paragraph 31: Four-Level Enhancement for Firearms Trafficking Under USSG §2K2.1(b)(5) — Impermissible Double Counting

Ms. Ingram objects to the +4 enhancement for firearms trafficking under USSG §2K2.1(b)(5). The PSR argues this enhancement is appropriate because the defendant "purchased the firearms for Navarro Figueroa, whom she knew could not purchase the firearms due to a prior domestic violence conviction."  But that would constitute improper double counting:  Ms. Ingram's offense level is already being adjusted by +6 due to number of firearms; and her actual Base Offense Level (14) already requires conviction under §922(a)(6) (which is the basis of Ms. Ingram's convictions) "with knowledge, intent or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person."  (It also forms a basis for BOL 20, should this Court overrule the Defendant's other objections as to imposing a BOL of 20 based on lack of large capacity firearm and/or prohibited person evidence).  Therefore, as articulated in Paragraph 31 this would constitute improper double counting.

**IV.    Paragraph 33: Failure to Apply Minor Role Reduction Under USSG §3B1.2**

Ms. Ingram objects to the PSR's failure to recommend a 2-level reduction for minor role.  Under Application Note 3(C) to §3B1.2, relevant factors include the degree to which the defendant understood the scope of the criminal activity, the degree to which the defendant participated in planning the activity, and the degree to which the defendant stood to benefit from the activity. "When the mitigating role commentary instructs courts to compare the defendant's culpability to that of "the average participant in the criminal activity," it is not referring to the actual level of culpability of any single participant. It is instead referring to the mathematical average, *i.e.*, a 'single value that represents the midpoint of a broad sample of subjects.'…Thus, '*all* likely participants in the criminal scheme' must be included in calculating the average." United States v. Dominguez-Caicedo, 40 F.4th 938, 960 (9th Cir. 2022) (citation omitted).

On each factor, Ms. Ingram's role was substantially less culpable than Navarro Figueroa's.  The PSR's own narrative contradicts its "equal culpability" finding at ¶24. The evidence establishes that Navarro Figueroa was the organizer, director, and financial backer of the trafficking scheme, while Ms. Ingram was a recruited purchaser acting under his direction and control.

First, Navarro Figueroa initiated the scheme. After he was denied a firearm purchase at C-A-L Ranch on December 11, 2021, he directed Ms. Ingram to begin purchasing firearms on his behalf.  Ms. Ingram did not independently conceive of or plan the trafficking operation.

Second, Navarro Figueroa provided all the money for the purchases.  Ms. Ingram's reported employment earnings between November 2021 and January 15, 2022 totaled approximately $3,500.00 (PSR ¶6).  But the firearms purchased had a combined value many times that amount.

Third, Navarro Figueroa controlled which firearms were purchased. He "would ask her to "buy certain makes and model firearms and would provide her the money" (Bates 0106, ¶21). During the February 10 purchase, Navarro Figueroa was overheard directing Ms. Ingram during a phone call, directing her where to have a meeting with ATF.

Fourth, Navarro Figueroa controlled the proceeds. He found the buyers and sold the firearms to unknown third parties. Ms. Ingram received only $500 to $1,000 per trip while Navarro retained the bulk of the profits. Three firearms were later recovered in Mexico in connection with violent crimes, reflecting a trafficking network that Navarro managed and Ms. Ingram had no knowledge of or contact with.

Fifth, Ms. Ingram had little to no knowledge of the final destination of any of the firearms. Navarro by contrast had a network of interested buyers with whom he engaged in the trafficking of these firearms.

## V. Paragraph 24: Culpability Assessment — "Equal Culpability" Finding

Ms. Ingram objects to the PSR's finding at ¶24 that "Navarro Figueroa and Ingram had equal culpability and jointly participated in the offense." For all the reasons set forth in Objection IV above, the evidence in the discovery demonstrates that Ms. Ingram was a recruited straw purchaser acting under Navarro Figueroa's direction and financial control. The "equal culpability" characterization is contradicted by the PSR's own factual findings at ¶¶6, 14, 21, 24, and 27, as well as the investigative reports in this case.

## VI. Failure to Recommend §5K2.12 Departure— Coercion and Duress

Section 5K2.12 provides for a downward departure where the defendant committed the offense because of serious coercion, blackmail, or duress, under circumstances not amounting to a complete defense. Ms. Ingram told agents that she received threats communicated through Navarro Figueroa that "if she did not continue to purchase the guns she would be killed" (PSR ¶27; Bates 0107, ¶22).   During her PSI interview she clarified that Navarro's threats concerned a third party, namely cartel associates with whom he engaged in the firearms trafficking business.  She also described becoming "concerned" when someone followed her into a gun store during a purchase and stated she had "reservations" about continuing (PSR ¶27).

**VII.    Paragraphs 29–39: Corrected Offense Level Calculations**

Based on the foregoing objections, Ms. Ingram submits the following corrected offense level calculations. The PSR's calculation and the defense's proposed calculation are presented side by side:

**PSR Calculation:**

Base Offense Level (§2K2.1(a)(4)(B)): 20

25–99 firearms (§2K2.1(b)(1)(C)): +6

Firearms trafficking (§2K2.1(b)(5)): +4

Role adjustment: None

**Adjusted Offense Level: 30**

Acceptance of responsibility: –3

**Total Offense Level: 27 (CHC I, range 70–87 months)**

**Defense Proposed Calculation:**

Base Offense Level (§2K2.1(a)(5)(A)): 14 (Objections I and II)

25–99 firearms (§2K2.1(b)(1)(C)): +6

Firearms trafficking (§2K2.1(b)(5)): 0 (Objection III)

Minor role (§3B1.2(b)): –2 (Objection IV)

**Adjusted Offense Level: 18**

Acceptance of responsibility: –3

**Total Offense Level: 15 (CHC I, range 18–24 months)**

If all of Ms. Ingram's objections are sustained, the corrected guideline range would be 18 to 24 months at Criminal History Category I.

Respectfully submitted this 17th day of April, 2026.

s/Taylor W. Fox
Taylor W. Fox